PER CURIAM:
The entire panel concurs in Parts I, II, and Part IV which discusses whether the appel-lees “utilized” Wilner Luxama’s services, and Part V which holds that appellees John and Felix Burton may be held liable for actual damages for their failure to verify Luxama’s registration under 29 U.S.C. § 1842. Judge Roney dissents from Part III, which holds that the Burtons were joint employers and therefore statutorily required to carry insurance or a liability bond.
In this case involving the Agricultural Workers Protection Act, 29 U.S.C. §§ 1801-1872 (1994) (AWPA), fifteen migrant farm workers challenge the district court’s grant of summary judgment in favor of the appel-lees John Burton, Felix Burton, Little Rock Produce Company and Bobby Hall. The district court found that the appellees were not joint employers of the farm workers under the AWPA and did not award the farm workers actual damages for a violation of the AWPA’s registration provision. We affirm in part, reverse in part and remand.
I. BACKGROUND
John Burton and Felix Burton (collectively, the Burtons) operated a farm in Brooks County, Georgia. The Burtons principally grew cotton, corn, soy beans and peanuts on their farm. In 1990, the Burtons decided to grow other vegetables — snap beans and cucumbers — and contracted with Little Rock Produce Company (Little Rock), a produce packinghouse, and its president and principal stockholder, Bobby Hall, to subsidize these new crops and to advance money for labor costs. Both were to share in the profits. Little Rock also agreed to supply the seeds for the snap bean and cucumber crops, boxes for the harvest and a trailer to transport the beans, and the Burtons in turn agreed to market these crops through Little Rock.
Pursuant to the contract, Little Rock required the Burtons to fertilize the snap bean crop and to obtain labor for its harvest. In 1990, the Burtons contacted the Georgia De *1326 partment of Labor to obtain workers for the snap bean crops, and Paul Emile Paul and Wilner Luxama, farm labor contractors (FLC), agreed to supply them with workers for the snap bean harvest. The Burtons eventually agreed to pay Luxama a set amount of money per box of snap beans that his crew picked, and Luxama paid each worker a set amount per box.[1] The 1990 harvest occurred too late in the snap bean season, and consequently, Luxama’s workers spent a total of one-half of a day working on the Burtons’ farm that year.
The next year, Luxama and his crew returned to the Burtons’ farm to harvest the 1991 snap bean crop. Luxama transported the 25 to 35 members of his Florida-based crew between the Burtons’ farm and their temporary housing in Ashburn, Georgia.[2] The Burtons would direct Luxama to a particular snap bean field, and his crew picked all of the field’s beans. Luxama directed and supervised the harvest of the snap beans, and the Burtons observed the progress of the workers approximately two to three times a day. As they picked the snap beans, the workers placed them in the boxes that Little Rock provided. At the end of the day, Luxa-ma weighed all of the boxes of snap beans, and a crew member placed the boxes onto a trailer that Little Rock owned. The Burtons then transported the snap beans to Little Rock’s packinghouse, where a broker selected and sold them.
The Burtons failed to earn a substantial profit from the 1991 snap bean crop, but they decided to plant and harvest them for the next year.[3] In 1992, Luxama returned with his crew to harvest the crop. Luxama’s registration as a farm labor contractor with the Department of Labor (as the AWPA requires) had lapsed in 1991 because he had failed to pay a fine that the Department of Labor had imposed. See 29 U.S.C. § 1811. As a result of this lapse and his inability to pay the fine, Luxama failed to purchase liability insurance for the vehicles used to transport his crew as the AWPA requires. See 29 U.S.C. § 1841.[4] The.Burtons failed to check Luxama’s certification as an FLC, and failed to learn that Luxama no longer carried the required insurance. See 29 U.S.C. §§ 1841(b) (duty to carry insurance of liability bond), 1842 (duty to check registration). On the morning of June 3, 1992, one of Luxama’s trucks overturned while transporting the workers to the fields, killing the driver and two workers and seriously injuring others.[5]
In December 1992, the appellants sued John Burton, Felix Burton, Little Rock and *1327 Hall for violations of the AWPA, the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. and Georgia’s common law of negligence. The appellants alleged, in part, that the appellees violated the “registration, vehicle safety, vehicle insurance, record keeping, wage statement and wage payment provisions of the AWPA,” and the appellees moved for summary judgment. After conducting an evidentiary hearing, the district court held that the appellees did not “employ” the workers within the meaning of the AWPA and the FLSA, and granted the ap-pellees summary judgment. See Charles v. Burton, 857 F.Supp. 1574, 1583 (M.D.Ga. 1994). This conclusion precluded the appellants from recovering any damages for the appellees’ failure to ensure that Luxama’s truck carried either insurance or a liability bond. See 29 U.S.C. § 1841(b)(1)(C).
Thereafter, the appellees moved for summary judgment on the remaining claims, with (1) Little Rock and Hall arguing that they had not “utilized” the services of Luxa-ma pursuant to the 29 U.S.C. § 1842; and (2) the Burtons alleging that although they had utilized Luxama’s services and violated the registration verification provisions under 29 U.S.C. § 1842, the workers were entitled only to statutory damages under 29 U.S.C. § 1854(c)(1). The district court granted Little Rock’s and Hall’s motions for summary judgment, finding that they had not “utilized” the services of Luxama and his crew. See Charles v. Burton, No. 92-150-VAL
(M.D.Ga. Mar. 7, 1995).[6] The district court later found the Burtons liable for $350 in statutory damages per worker for the violation- of section 1842, but- refused to award actual damages because the workers’ injuries were “too far removed” from the Burtons’ failure to verify Luxama’s registration. See Charles v. Burton, No. 7:92-cv-150 (M.D.Ga. Sept. 8, 1995) (granting summary judgment); Charles v. Burton, No. 92-150-VAL (M.D.Ga. July 26, 1996) (awarding statutory damages).[7]
II. ISSUES
The issues we discuss are: (1) whether the district court erred in finding that the appellees were not “joint employers” of the appellants, and were thus not liable under section 1841 of the AWPA (Part III); (2) whether the district court erred in finding that appellees Little Rock and Hall .did not “utilize” the services of the appellants under section 1842 of the AWPA (Part IV); and (3) whether the district court erred in failing to award the appellants actual damages for the Burtons’ violation of that provision (Part V).[8]
III. JOINT EMPLOYMENT
In 1983, Congress enacted the AWPA “to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers; to require farm labor contractors to register under this chapter; and to assure necessary protections for *1328 migrant and seasonal agricultural workers, agricultural associations, and agricultural employers.” - 29 U.S.C. § 1801. Included in the AWPA are requirements (1) that an FLC .obtain a certificate from the Secretary of Labor authorizing it to perform its duties, see 29 U.S.C. § 1811(a); 29 C.F.R. § 550.40 (1997); (2) that a person utilizing the services of an FLC verify the existence of such certificate, see 29 U.S.C. § 1842; and (3) that an FLC and an agricultural employer carry either an insurance policy or liability bond covering any vehicle used to transport agricultural workers, see 29 U.S.C. § 1841; 29 C.F.R. 500.120.
The appellees contend, and the district court agreed, that they did not “employ” the appellants, that they were not “agricultural employers” or “joint employers” within the meaning of the AWPA and that the AWPA did not require them to carry insurance or a liability bond under section 1841.[9] See Charles, 857 F.Supp. at 1588. The definition of “employ” is the same under the AWPA and the FLSA. See 29 U.S.C. § 203(1); 29 U.S.C. § 1802(2). An entity “employs” a person under the AWPA and the FLSA if it “suffers or permits” the individual to work. See 29 U.S.C. § 203(g); 29 C.F.R. § 500.20(h)(1). “An entity ‘suffers or permits’ an individual to work if, as a matter of economic reality, the individual is dependent on the entity.” Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir.1996) (quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 34, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)).
The AWPA’s concept of “employ” also includes “the joint employment principles applicable under the [FLSA].” Aimable v. Long & Scott Farms, 20 F.3d 434, 438 (11th Cir.), cert. denied, 513 U.S. 943, 115 S.Ct. 351, 130 L.Ed.2d 306 (1994); 29 C.F.R. § 500.20(h)(5).[10] According to the AWPA regulations,
joint employment means a condition in which a single individual stands in the •relation of an employee to two or more persons at the same time. A determination of whether the employment is to be considered joint employment depends upon all the facts in a particular case. If the facts establish that two or more persons are completely disassociated with respect to the employment of a particular employee, a joint employment situation does not exist.
29 C.F.R. § 500.20(h)(5). The issue in joint employment cases “is not whether the worker is more economically dependent on the independent contractor or grower, with the winner avoiding responsibility as an employer.” Antenor, 88 F.3d at 932. Instead, the AWPA “envisions situations where a single employee may have the necessary employment relationship with not only one employer but simultaneously such a relationship with an employer and an independent contractor.” Antenor, 88 F.3d at 932 (quoting H.R.Rep. No. 97-885, 97th Cong., 2d Sess. (1982) 7, 1982 U.S.C.C.A.N. 4547, 4553).
This court, and the AWPA regulations, have considered the following regulatory fac *1329 tors as guidance in determining economic dependence, and ultimately, whether an employment relationship exists: (1) whether the agricultural employer has the power, either alone or through the FLC, to direct, control or supervise the workers or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties); (2) whether the agricultural employer has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the workers; (3) the degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue; (4) the extent to which the services that the workers rendered are repetitive, rote tasks requiring skills that are acquired with relatively little training; (5) whether the activities that the workers performed are an integral part of the overall business operation of the agricultural employer; (6) whether the work is performed on the agricultural employer’s premises, rather than on premises that another business entity owns or controls; and (7) whether the agricultural employer undertakes responsibilities in relation to the workers that employers commonly perform, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers’ compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment). See 29 C.F.R. § 500.20(h)(5)(iv)(A)-(G); see also Antenor, 88 F.3d at 932; Aimable, 20 F.3d at '439.
We will consider all of the enunciated factors as guidance, with “the weight of each factor [depending] on the light it sheds on the farmworkers’ economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case.” Antenor, 88 F.3d at 932-33 (citing Aimable, 20 F.3d at 440). A determination of employment status under the AWPA and the FLSA is a question of law subject to de novo review. See Antenor, 88 F.3d at 929; Aimable, 20 F.3d at 440.
1. Whether the appellees had the power to direct, control or supervise the appellants (directly or indirectly).
Prior to 1997, the AWPA regulations split this factor into two concepts: first, the nature and degree of control over the workers; and second, the degree of supervision over their work. The district court also considered these two concepts separately. As for the nature and degree of control of the appellants, the district court found that “there is absolutely no indication ... that defendants [Hall] and Little Rock retained the ‘right to dictate the manner in which the details of the harvesting function [were] executed.’ ” Charles, 857 F.Supp. at 1580 (quoting Donovan v. Brandel, 736 F.2d 1114, 1119 (6th Cir.1984)). The district court also found that “although defendants John and Felix Burton retained a degree of control over the harvest in that they directed which fields would be picked, they maintained no control over the manner in which the beans were picked. The details of the harvest were left to [Luxa-ma].” Charles, 857 F.Supp. at 1580.
In Aimable, this court found that the focus of this concept “is more properly limited to specific indicia of control (for example, direct employment decisions such as whom and how many employees to hire, whom to assign to specific tasks, and how to design the employee’s management structure).” Aimable, 20 F.3d at 440. Antenor identified several other indicia of control, including: when work should begin on a particular day; whether a worker should be disciplined; whether the agricultural employers were free to delay or stop the workers directly from continuing their work; and whether the agricultural employers could assign work to specific workers indirectly. See Antenor, 88 F.3d at 933-34. The evidence presented demonstrated that while Little Rock supplied boxes to the Bur-tons to be used for the appellants, neither *1330 Hall nor Little Rock engaged in direct or indirect control over the appellants. See, e.g., Patel v. Wargo, 803 F.2d 632, 638 (11th Cir.1986) (finding that company’s president, director and principal stockholder did not take a sufficiently active role to be an “employer” under the FLSA). The Burtons, however, exhibited some control. For example, the Burtons determined the particular fields that they wanted the appellants to cultivate, determined when the appellants would begin picking each field and supplied appellants with boxes that Little Rock provided. They did not, however, tell Luxama when to commence picking each day and did not determine whether a specific worker should be disciplined. See Hodgson v. Griffin & Brand of McAllen, Inc., 471 F.2d 235, 237 (5th Cir.) (finding that agricultural worker exercised sufficient control in determining when the workers were to commence harvesting each day to be an “employer” under the AWPA), cert. denied, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). Therefore, although we agree with the district court that this aspect of the first factor weighs against finding that the appellants were economically dependent on Hall and Little Rock, we find that the Burtons exercised some aspects of control that weigh in favor of finding that the appellants were economically dependent on the Burtons.
The second aspect of this factor concerns the degree of direct or indirect supervision that the agricultural employer enjoyed over the workers. The necessary supervision under this factor “includes overseeing the pickers’ work and providing direction,” while keeping in mind “special aspects of agricultural employment.” Antenor, 88 F.3d at 934-35. In an agricultural setting, “the grower is not expected to look over the shoulder of each farmworker every hour of every day. Thus, it is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor.” Antenor, 88 F.3d at 935 (quotations and citations omitted). “Infrequent assertions of minimal oversight,” however, fail to satisfy the supervision necessary under this factor. See Aim-able, 20 F.3d at 441.
The workers alleged, and the record reveals, that the Burtons directed Luxama to tell the appellants to harvest certain areas of their farm and monitored them harvesting several times per day.[11] The Burtons, however, entrusted most of the direct supervision and oversight over the appellants in Luxama. We believe that the Burtons’ supervision overcomes Aimable’s “infrequent assertions of minimal oversight” and instead resembles Antenor’s definition of indirect control. The workers, however, have not presented any evidence that Little Rock or Hall directly or indirectly supervised their work in any fashion. We therefore find that this first factor favors a conclusion that the appellants were economically dependent on the Burtons, based on their indirect control and supervision. We also find that this factor weighs against such a conclusion as for Little Rock and Hall.
2. Whether the appellees had the direct or indirect power to hire, fire, modify the employment conditions or determine the pay rates or the methods of wage payment for the appellants.
The district court also considered aspects of this factor separately. First, the appellants argued that the appellees ultimately shared responsibility for their wages, because the appellees controlled the amount of seeds planted and fields harvested and paid Luxama a specific price for each box of beans harvested, and that Luxama then paid the. appellants a set price for each box that they individually harvested. The appellees rely on Rutherford Food Corp. v. McComb, where the Supreme Court found the operator of a slaughterhouse exerted indirect influence *1331 over the pay rates for the boners when he controlled the number of cattle slaughtered and boned. 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). The district court found that Aimable precluded the reliance on McComb, finding this “leap of logic” — since the appellees controlled the amount of money Luxama received, and since Luxama controlled the amount the appellants received, that the appellees therefore controlled the amount the appellants received — to be unfounded. See Aimable, 20 F.3d at 442 (“Unfortunately for appellants, the laws that bind the Euclidian world do not apply with equal force in federal employment law.”); Charles, 857 F.Supp. at 1580. The appellants presented no other convincing evidence to show that the appellees exercised direct or indirect power to determine their pay rates or the methods of payments. In fact, Luxama controlled their pay rates, determined how they received their pay and when they received payment.
The appellants also argue that the Bur-tons, on behalf of their enterprise with Hall and Little Rock, delegated the task of assembling a picking crew to Luxama and therefore indirectly enjoyed the rights to hire, fire or modify the employment conditions of the appellants. In Antenor, this court found that evidence showing that the agricultural employers “dictated the workers’ hours, a condition of employment, by deciding when the work was to begin ... [and] forcing the pickers to stop picking when prices were bad[,]” indicated that they enjoyed these rights. See Antenor, 88 F.3d at 935. The Burtons planted and fertilized the snap bean crop and directed Luxama to have the appellants harvest it on certain dates. While the Burtons did not enjoy a ‘veto” power over Luxama’s hiring decisions and did not modify such employment conditions as the picker’s daily hours, they decided ultimately when the appellants would begin picking their snap bean crop, where they would pick it and for how long. Thus, elements of this factor weigh in favor of the appellants being economically dependent on the Burtons. Again, though, the appellants present no evidence that either Hall or Little Rock directly or indirectly enjoyed this power.
3. The degree of permanency and duration of the relationship of the parties.
The district court did not consider this factor, following Aimable’s holding that this factor is irrelevant in analyzing joint employment. See Aimable, 20 F.3d at 443-44; Charles, 857 F.Supp. at 1579. The Aimable court found that this factor helped determine whether the FLC, as opposed to any other putative agricultural employer, employed the farm workers. See Aimable, 20 F.3d at 444. We note that the Aimable court nonetheless analyzed this factor, and, given its inclusion in the AWPA’s regulations, feel that its analysis should provide this court guidance in determining “the economic reality of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer.” 29 C.F.R. 500.20(h)(5)(iv)(C); Antenor, 88 F.3d at 933.[12]
The appellants allege that they had an ongoing relationship with the appellees because they spent most of their time during the 1992 snap bean harvest season working for them. Additionally, they contend that Luxama’s relationship with the appellees was *1332 longstanding in that he had provided workers for their snap bean harvests between 1990 and 1992. The appellees allege, pursuant to Aimable, that the evidence showed that only Luxama, not the appellees, had the ongoing-relationship with the appellants. The appel-lees also argue that no evidence indicated that the appellants harvested the snap bean crop in 1990 or 1991, and that the evidence showed that some of the appellants may have worked at a different farm during the snap bean harvest, and others may have chosen to stay home on certain days during the harvest.
Other courts have considered this issue and have found that “[h]arvesting of crops is a seasonal industry, without much permanence beyond the harvesting season. However temporary the relationship may be ... the relationship is permanent ... [if] the migrants work only for [the] defendants during that season.” Haywood v. Barnes, 109 F.R.D. 568, 589 (E.D.N.C.1986) (quoting Donovan v. Gillmor, 535 F.Supp. 154, 162 (N.D.Ohio), appeal dismissed, 708 F.2d 723 (6th Cir.1982)). Another court has found that “[o]ne indication of permanency ... is the fact that it is not uncommon for the migrant families to return year after year.” Secretary of Labor v. Lauritzen, 835 F.2d 1529, 1537 (7th Cir.1987), cert. denied, 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232 (1988). Luxama and the appellants harvested snap beans on the Burtons’ farm in 1992. While this harvest was seasonal, the Burtons expected Luxama’s crew to harvest the entire snap bean crop. Luxama and the appellants also worked for another farm during this snap bean harvest.[13] While Luxama returned between 1990 and 1992 to harvest the Burton’s snap bean crop, the appellants presented no evidence to show that all of them picked snap beans for the Burtons during these dates. Therefore, we find that the appellants have failed to meet the permanency and exclusivity factor, and this factor weighs against a determination that the appellants were economically dependent on the appellees.
4. The extent to which the services that the appellants rendered are repetitive, rote tasks requiring skills that are acquired with relatively little training.
The district court also failed to consider this factor in determining- that the appellees were not joint employers of the appellants, and the Aimable court found that an analysis of this factor fails to aid in this determination. See Aimable, 20 F.3d at 444. We, however, choose to analyze this factor, since it is included in the AWPA’s regulations.[14] It is unquestionable that the services that the appellants rendered — picking snap beans — is a repetitive and rote task requiring relatively little training. Therefore, we find that this factor weighs in favor of concluding that the appellants were economically dependent on the appellees.
5. Whether the activities that the appellants performed are an integral part of the appellees’ overall business operation.
This factor is “probative of joint employment because a worker who performs a routine task that is a normal and integral phase *1333 of the grower’s production is likely to be dependent on the grower’s overall production process.” Antenor, 88 F.3d at 937. The district court held that this factor favored the appellants, finding that they “performed a line-job integral to the harvesting and production of salable vegetables.” Charles, 857 F.Supp. at 1581 (quoting Aimdble, 20 F.3d at 444). While the Burtons contend that then-snap bean harvest comprised a small percentage of their overall farming operations, we find that this factor weighs in favor of determining that the appellants were economically dependent on the Burtons, Little Rock and Hall because the appellants’ picking of snap beans was integral to both harvesting and producing snap beans — the ap-pellees’ business.
6. Whether the work is performed on the appellees’ premises, rather than on premises that another business entity owns or controls.
This factor is probative of joint employment because “without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors.” Antenor, 88 F.3d at 937 (citing Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 513-14 (5th Cir.1969)). The district court correctly found that the appellants picked snap beans on the Burtons’ property, which provides indicia that the Burtons employed the workers. The district court also found, however, that no party presented any evidence that the appellants performed any work on the property of either Little Rock or Hall. Thus, we find that this factor weighs in favor of finding that the appellants were economically dependent on the Burtons, but were not economically dependent on either Little Rock or Hall.
7. Whether the appellees undertook responsibilities in relation to the appellants that employers commonly perform.
The district court did not consider this factor, finding that one of its considerations, “investment in equipment and facilities,” to be irrelevant pursuant to Aimable. Aimdble, 20 F.3d at 443; Charles, 857 F.Supp. at 1579. Once again, because this factor is enunciated in the AWPA’s regulations, and considered in Antenor, we consider it as guidance in our determination of “economic dependence” and “joint employment.”[15] The evidence, viewed in the light most favorable to appellants, demonstrates that neither Little Rock, Hall nor the Burtons had any responsibility in preparing or making payrolls, paying FICA taxes, or providing workers compensation insurance for the appellants. Little Rock issued checks to Luxama for the number of boxes his crew picked, but these payments were advances to the Burtons for their labor costs. Luxama paid the appellants for the number of boxes they picked and provided housing and transportation for the appellants. Little Rock also provided the Burtons with boxes for the appellants to place the picked snap beans in and provided a trailer for the Burtons to transport the snap beans to Little Rock’s packing shed. Although the appellees provided certain materials useful in the appellants’ work, which is probative of the appellants’ economic dependence on the appellees, the appellees did not undertake any other functions that an employer normally performed. Thus, we find that this factor weighs in favor of determining that the appellants were not economically dependent on the appellees.
In considering all of these factors, we realize that “no one factor is deter *1334 minative,” and that the existence of joint employment “depends on the economic reality of all the circumstances.” Anterior, 88 F.3d at 932 (quotations and citations omitted). We note that “the absence of evidence on any one or more of the criteria listed does not preclude a finding that an ... agricultural employer was a joint employer along with the crewleader.” Anterior, 88 F.3d at 933 (quotations and citations omitted). We also note that since the AWPA is a remedial statute, we must construe it broadly. See Caro-Galvan, 993 F.2d at 1505 (“AWPA is a remedial statute and should be construed broadly to effect its humanitarian purpose.”). Based on our analysis of the factors, we hold that the appellants were economically dependent on the Burtons, and, as a matter of law, that the Burtons employed the appellants under the AWPA. The Burtons enjoyed a sufficient degree of indirect supervision and control over the appellants, supplied the land and ultimately decided when, where and how long the appellants would harvest their snap bean crop. Further, the appellants performed services that required little training, yet were integral to the Burtons’ farming operation. Because we hold that the Bur-tons employed the appellants, they are liable as joint employers for violations of section 1841 of the AWPA. We also hold that, based on our analysis of these factors, Little Rock and Hall did not employ the appellants within the meaning of the AWPA.[16]
IV. UTILIZATION OF SERVICES
The next issue we discuss is whether the appellees “utilized” Luxama’s services. See 29 U.S.C. § 1842. According to section 1842, unless a person utilizes the services of a farm labor contractor to supply an agricultural worker, there is no responsibility to be concerned about the farm labor contractor’s certificate of registration. See 29 U.S.C. § 1842. Even though Little Rock and Hall did not “employ” appellants, they can be liable under section 1842 because it speaks only of a person who utilizes the services of an FLC, not an “employer.”
The district court granted Little Rock’s and Hall’s motions for summary judgment on this issue, finding that neither Little Rock nor Hall “utilized” Luxama’s services because the Burtons exercised the discretion to hire Luxama, and exercised subsequent control over Luxama and the appellants. See Charles v. Burton, No. 92-150-VAL (M.D.Ga. Mar. 7, 1995).
We find that the district court did not err in granting summary judgment for Hall and Little Rock, based on our analysis of “joint employment” and “economic dependence.” The appellants presented no evidence that Little Rock or Hall engaged in directing, controlling or supervising the appellants. Further, Little Rock and Hall did not hire Luxama, but instead delegated the decision of hiring and paying for snap bean labor to the Burtons. Therefore, we agree with the district court that neither Little Rock nor Hall “utilized” the services of Luxama and the appellants. The Burtons however, concede that they utilized Luxama’s services. We agree with the district court that the Burtons “utilized” the services of Luxama and the appellants, based on this same analysis.
V. DAMAGES
Having utilized the services of appel-lees, there was a statutory obligation on the part of John and Felix Burton to “first take[ ] reasonable steps to determine that the farm labor contractor possessefd] a certificate of registration which [was] valid and *1335 which authorized] the activity for which the contractor [was] utilized.” 29 U.S.C. § 1842. The Burtons concede they failed to determine if the farm labor contractor had a valid certificate authorizing him to transport agricultural workers. See Burtons’ Brief in Support of Mot. for Summ. J. at 4 (“The Burtons did not check to see if [Luxama] had a certificate of registration when he came to the Burton’s farm with the Haitian crew to pick beans.”).
The district court granted the Burtons’ motion for summary judgment in part, finding that the AWPA’s legislative history failed to adopt a position on strict liability, and finding that the Burtons were not liable for the appellants’ actual damages because their failure to check Luxama’s certificate of registration was “too far removed from the type of harm complained of’ to attribute actual damages to the Burtons. The district court therefore found that it should only award statutory damages of up to $500. Charles v. Burton, No. 7:92-cv-150 (M.D.Ga. Sept. 8, 1995). The district court later awarded the appellants $350 in statutory damages, finding the Burtons’ violations to be “technically intentional.” See 29 U.S.C. 1854(c)(1); Charles v. Burton, No. 92-150-VAL (M.D.Ga. July 26, 1996).
The district court erred by holding that the Burtons’ failure to verify Luxama’s registration, in violation of 29 U.S.C. § 1842, was too far removed from the appellants’ injuries to warrant actual damages under 29 U.S.C. § 1854(c). Appellants do not claim the Bur-tons are responsible for the accident or their resulting physical injuries. Instead, they claim an inability to obtain medical care and a lack of compensation for lost wages because Luxama had no insurance coverage. Such a lack of access to insurance proceeds is an injury separate and distinguishable from appellants’ physical injuries. See, e.g., Huff v. Standard Life Ins. Co., 897 F.2d 1072, 1074 (11th Cir.1990) (“[T]he very essence of’ a cause of action for negligent delay in the processing of an insurance application “is that the insurance company’s negligence caused the absence of insurance coverage, which in turn damages the applicant.”), cert. denied, 499 U.S. 936, 111 S.Ct. 1386, 113 L.Ed.2d 443 (1991); Michigan Abrasive Co., Inc. v. Poole, 805 F.2d 1001, 1003, 1005-06 (11th Cir.1986). This is true even though appellants do not claim that the Burtons’ actions caused them to be uninsured, but instead claim that the Burtons’ actions precluded them from having access to insurance coverage which another person, in this case Luxama, was required to maintain. See, e.g., Lippincott v. Exotica Imports, Inc., 413 So.2d 66, 67 (Fla.Dist.Ct.App.1982) (Defendant, an automobile dealer, sold a vehicle to a purchaser who did not have insurance coverage, dealer failed to verify that purchaser had insurance coverage, plaintiff was involved in an automobile accident while a passenger in purchaser’s vehicle, plaintiff sued dealer, and court held that dealer “should be responsible to” plaintiff because it “did cause injury to [plaintiff] in that [plaintiff] was without the protection of [insurance] benefits at the time of the accident.”). The Burtons’ failure to check Luxama’s certificate of registration was not far removed from the appellants’ inability to obtain medical care and compensation for lost wages at all.
Luxama did not possess a certificate of registration and had no insurance to cover the damages that resulted from plaintiffs’ physical injuries. To obtain a certificate of registration, Luxama, like any other farm labor contractor, would have had to produce documentation showing that he had an insurance policy or liability bond which insured “against liability to persons ... arising from the ownership, operation, or the causing to be operated, of any vehicle used to transport any migrant or seasonal agricultural worker.” 29 U.S.C. § 1841(b)(1)(C); see 29 U.S.C. § 1812(2).
If the Burtons had utilized a farm labor contractor with a valid certificate of registration, there would have been insurance to cover appellants’ physical injuries. See 29 U.S.C. §§ 1812(2); 1841(b)(1)(C). This uncontested fact is contrary to the district court’s decision that “defendants’ failure to check Mr. Luxama’s certificate of registra *1336 tion is simply too far removed from the type of harm complained of for actual damages to be attributable to defendants.” The Burtons’ failure to determine whether Luxama had a valid certifícate of registration was a proximate cause of the appellants’ damages, not their physical injuries, but the damages that accrued because there was no insurance to cover their medical care and lost wages.
VI. CONCLUSION
Based on the foregoing, we reverse the district court’s holding that the Burtons did not employ the appellants, affirm the district court’s finding that neither Little Rock nor Hall employed the appellants or utilized their services, and remand this ease to the district court to consider damages for the Burtons’ failure to ensure that the automobiles transporting the appellants carried insurance or a liability bond, in violation of 29 U.S.C. § 1841, and to consider damages for the Bur-tons’ failure to verify Luxama’s certificate of registration before utilizing his services, in violation of 29 U.S.C. § 1842.
AFFIRMED IN PART, REVERSED IN PART and REMANDED.

. According to Luxama's deposition testimony, the Burtons agreed to pay him between $3.75 and $4 per box. Luxama in turn paid his workers $2.50 per box for the first picking, and then $3 per box for the second and additional pickings. Luxama provided his workers a ticket for each box they picked, and then paid them for each ticket the worker returned to him.

. Luxama recruited his workers (Haitian immigrants) from Miami to pick crops, including snap beans, in Georgia. He also helped the workers find housing when they arrived in Georgia, although the crew paid for all of its housing expenses.

. Since the 1991 crop failed to make a profit, the Burtons did not reimburse Little Rock’s advancements for their labor costs.

. Section 1841(b) of the AWPA provides:
(1) When using, or causing to be used, any vehicle for providing transportation ... each agricultural employer, agricultural association, and farm labor contractor shall ...
(C) have an insurance policy or a liability bond that is in effect which insures the agricultural employer, the agricultural association, or the farm labor contractor against liability for damages to persons or property arising from the ownership, operation, or the causing to be operated, of any vehicle used to transport any migrant or seasonal agricultural worker.
See 29 U.S.C. § 1841(b)(1)(C).

.The accident killed appellant Jean J. Maisso-neuve (Avelie Maissoneuve appears as tire personal representative of his estate), rendered appellant Edner Phillipe a paraplegic, and caused various injuries to appellants Nicolas Charles, Charite Asseigne, Miguel Aubout, Samson Ger-main, Marcel Jean-Baptiste, Alexandre Joseph, Marcel Joseph, Fito Pierre, Frankel Pierre, Fata-mi Saint Fleur, Gerard Simeon, Lavius Dit Servi-us Vil and Jean Jacques Vytelle. We shall refer to these workers collectively as the appellants.

. Appellee Bobby Hall died in October 1995, and the district court treated the appellants’ motion for substitution of party as a motion to substitute Bobby Hall, Jr. (the administrator of Bobby Hall’s estate) as a defendant, and granted the appellants' motion. See Charles v. Burton, No. 7:92-cv-150 (M.D.Ga. July 30, 1996). Appellee Hall contends that the district court erred in substituting him pursuant to Federal Rules of Civil Procedure 25(a). We find that the district court did not abuse its discretion in substituting Bobby Hall, Jr., as a defendant after the appellants timely filed a motion for substitution pursuant to Rule 25(a). See Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1357-58 (11th Cir.1994) (interpreting Federal Rule of Civil Procedure 25(c)).

. In August 1995 the appellants also filed diversity lawsuits alleging common law negligence claims against Little Rock and the Burtons. The district court consolidated those claims with the AWPA and FLSA claims and granted summary judgment in favor of Little Rock and the Burtons on the common law negligence claims. See Charles v. Burton, No. 7:92-150 (M.D.Ga. Nov. 30, 1995) (consolidating); Charles v. Burton, No. 7:92-cv-150 (M.D.Ga. Aug. 20, 1996) (granting summary judgment).

. The appellants raise for the first time the issue of whether the appellees formed a partnership or joint venture under Georgia law. This court, however, will not consider on appeal issues not raised before the district court. See Narey v. Dean, 32 F.3d 1521, 1526-27 (11th Cir.1994).

. The AWPA defines "agricultural employer’’ as “any person who owns or operates a farm, ranch, processing establishment, cannery, fin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker.” 29 U.S.C. § 1802(2). The AWPA defines "migrant agricultural worker” as "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent' place of residence.” 29 U.S.C. § 1802(8)(A).

. In 1997, the Department of Labor amended tire AWPA regulations, attempting to remedy the misconceptions surrounding the definition of "joint employment.” This clarification of joint employment focuses more closely on the "economic dependence" test that federal courts had previously established. See Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. 11734, 11745-46 (1997) (codified at 29 C.F.R. pt. 500 (1997)). This court accords significant weight to the statutory interpretation of the executive agency charged with implementing the statute being construed, particularly when that interpretation is incorporated in a formally published opinion. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1507 (11th Cir.1993).

. Appellant Asseigne observed the Burtons near their worksite often, and noticed that they talked to Luxama. See Asseigne Dep. at 31. Appellant Aubout stated that he observed the Burtons talking to Luxama, and since most of the appellants did not speak English, Luxama then instructed the appellants in their native language what the Burtons needed. See Aubout Dep. at 17-18.

. The Department of Labor additionally commented on this issue, stating that, despite Aima-ble,
the great weight of the case law supports consideration of the degree of permanency and exclusivity in the relationship between the workers and the putative employer in the context of the agricultural operation in question. The duration of that operation necessarily affects the duration or permanency of that relationship. Where an FLC and the workers are engaged for the duration of the operation and are obligated to work only for or be available to the agricultural employer/association at his/ her discretion during that period, that information bears directly on the question of the workers’ economic dependence. Other courts have found this factor relevant and the Department believes that duration of the relationship should be one of the factors considered in determining joint employment.
Agricultural Workers Protection Act, 62 Fed.Reg. at 11,740 (citations omitted).

. Luxama stated that at times he would send some of the appellants to pick snap beans at a nearby farm in Tifton, Georgia. Luxama Dep. at 56.

. The Department of Labor explained:
[C]ourts have considered the worker's degree of skill to be a relevant and probative factor in the determination of [economic] dependence. In common experience in the agricultural industry and other contexts, there is a reasonable correlation between the worker's degree of skill and the marketability and value of his/her services. In the free market place, an unskilled task may easily be learned and performed by almost an}' worker is a task for which many workers (both trained and untrained) can realistically compete, and is also a task for which the competing workers would not be able to demand or expect high wages. The lower the worker's skill level, the lower the value and marketability of his/her services, and the greater the likelihood of his/her economic dependence on the person utilizing those services.
Agricultural Worker Protection Act, 62 Fed.Reg. at 11,740-41.

. The Department of Labor commented:
Where a putative employer provides materials or services, undertakes functions normally performed by an employer (such as providing workers' compensation, paying FICA taxes, transporting or housing workers, providing the tools and equipment necessary to the work), such behavior indicates that it is his/her interest to perform such functions that are commonly performed by employers rather than rely on the FLC. Further, workers who use the services, materials or functions are in a very tangible way economically dependent on the entity performing these functions.
Agricultural Workers Protection Act, 62 Fed.Reg. at 11,741-42.

. We note the district court’s holding that to find the Burtons joint employers under the AWPA, "every farmer who hired a farm labor contractor would become for purposes of the AWPA ... a joint employer of the contractor’s employees.” Charles, 857 F.Supp. at 1581-82. We disagree, finding that the economic reality of the facts in this case indicate that the Burtons employed the appellants. We caution district courts to analyze each of these enunciated factors as guidance, taking into account the facts of each case, and the economic reality of each situation, to determine whether a farm worker is economically dependent on an agricultural employer.