[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT**
**September 25, 2003**
**THOMAS  K. KAHN
CLERK**

No. 02-12201

D. C. Docket No. 00-00036 CV-4-RV-SMN

FLAVIO GONZALEZ-SANCHEZ,
TIMOTEO LOPEZ-SOLIS,
RAFAEL MARTINEZ-RAMIREZ,
FRANCISCO JARQUIN-RAMIREZ,
JERONIMO LUCAS-GARCIA,

Plaintiffs-Appellants,

versus

INTERNATIONAL PAPER COMPANY,
UNION CAMP CORPORATION,

Defendants-Appellees,

IP FOREST RESOURCES COMPANY, et al.,

Defendants.

Appeal from the United States District Court
for the Northen District of Florida

**(September 25, 2003)**

Before TJOFLAT and BLACK, Circuit Judges, and NANGLE[*], District Judge.

PER CURIAM:

In this case, five migrant employees of farm labor contractors ("FLCs") sue on behalf of themselves and other migrant workers under the Fair Labor Standards Act, 29 U.S.C. §§ 201-19[1] and the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-72.[2] They seek monetary relief from two manufacturers of paper products who hired the FLCs to plant tree seedlings in the manufacturers' forests. According to the migrant employees, the manufacturers were their "joint employers," along with the FLCs, and are therefore liable for such relief. The migrant employees also moved to proceed as a class of

---

[*]Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

[1]The relevant part of the Fair Labor Standards Act, 29 U.S.C. § 216(b), provides that "[a]n action to recover [unpaid minimum wages or overtime compensation] may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."

[2]The relevant part of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1854, in subsection (a), authorizes "[a]ny person aggrieved by a violation of" the act to file suit in a United States district court. Subsection (c) authorizes the court to award "damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation, or other equitable relief." If the court certifies the suit as a class action, the court "shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief."

plaintiffs. On cross-motions for summary judgment, the district court held that the manufacturers were not joint employers. Then, without determining whether a class should be certified, the court entered a final judgment for the manufacturers. The employees now appeal. In addition to contending that the district court should have granted their motion for summary judgment on the joint employment issue, they ask that the court consider whether the case should proceed as a class action.

The facts and issues presented in this case closely mirror those we addressed recently its companion case, <u>Martinez-Mendoza v. Champion International Corp.</u>, No. 02-12171, slip op. (11th Cir. Aug. 5, 2003). For reasons discussed at length in <u>Champion,</u> we affirm the district court's determination that the manufacturers were not joint employers with the FLCs. We also conclude again that the court erred in declining to address the issue of class certification. Consequently, we remand for further consideration of whether this case should proceed as a class action.

I.

A.

The manufacturers in this case are International Paper Company ("IP") and Union Camp Corporation ("UC"). IP conducts a wide variety of business operations around the globe, including most prominently the production of paper

products. UC was a diversified paper and forest products company. It merged into IP in 1999.

As part of their operations, IP and UC maintained forest land. They harvested this land for a portion of their raw materials and purchased additional materials from other companies. IP and UC procured assistance in regenerating their forests by contracting with various FLCs.[3] The FLCs supplied agricultural workers, consisting primarily of Mexican migrants, to plant seedlings by hand. In most material respects, the process for hand planting and the relationship between the FLCs, agricultural workers, and manufacturers were similar to those described in Champion.

## II.

## A.

The manufacturers' liability under the Migrant and Seasonal Agricultural Worker Protection Act, as well as the Fair Labor Standards Act, depends on whether IP and UC "employed" the agricultural workers. The definition of "employ" is the same under both statutes: an entity "employs" a person if it "suffer[s] or permit[s]" the individual to work. See 29 U.S.C. § 203(g); 29 U.S.C.

_____

[3] Appellant Gonzalez-Sanchez was employed by an FLC named Express Forestry, Inc. Jarquin-Ramirez, Martinez-Ramirez, and Lucas-Garcia worked for F&K Enterprises. Lopez-Solis worked for Eller & Sons Trees, Inc.

§ 1802(5). "An entity 'suffers or permits' an individual to work if, as a matter of economic reality, the individual is dependent on the entity." Charles v. Burton, 169 F.3d 1322, 1328 (11th Cir. 1999) (citation omitted).

Since joint employment relationships—where a single individual stands in the relation of an employee to two or more persons at the same time—are common in agriculture, see 29 C.F.R. § 500.20(h)(5),[4] both statutes deliberately make "it clear that a worker can be economically dependent on, and thus jointly employed by, more than one entity at the same time."[5] Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996). Moreover, "even if a farm labor contractor is found to be a bona fide independent contractor, this status does not as a matter of law negate the possibility that an agricultural employer may be a joint employer . . . of

---

[4] In 1997, the Department of Labor amended its regulation in an attempt to clarify the "joint employment" definition. See Final Rule Issued Pursuant to Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. 11734 (1997) (codified at 29 C.F.R. § 500.20 (1997)). This court, as required by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.E.2d 694 (1984), accords significant weight to the statutory interpretation of the executive agency charged with implementing the statute being construed, particularly where, as here, that interpretation is incorporated in a formally published regulation. Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1507 (11th Cir. 1993).

[5] The federal regulation states that the joint employer doctrine is a "central foundation" of the MSAWPA because it is "the best means" to fulfill the purpose of the act, which is "to reverse the historical pattern of abuse and exploitation of migrant and seasonal farm workers." 29 C.F.R. § 500.20(h)(5)(ii) (citation omitted). The joint employer doctrine effects this purpose by protecting "all those hired by middlemen to toil in our nation's fields, vineyards, and orchards." Caro-Galvan, 993 F.2d at 1505 (citation and internal quotation mark omitted).

the [laborers] together with the farm labor contractor." 29 C.F.R.

§ 500.20(h)(5)(ii) (citation and internal quotation marks omitted). If, as a matter

of economic reality, a laborer is dependent upon both the FLC and the agricultural

employer, then a joint employment relationship exists, and the laborer will be

considered an employee of both entities. See Antenor, 88 F.3d at 930. On the

other hand, if the two entities are commonly disassociated with respect to the

employment of a particular employee, a joint employment situation does not exist.

See 29 C.F.R. § 500.20(h)(5).

In Champion, seven factors guided our analysis of the joint employment

issue. The same factors[6] guide us here and, for reasons discussed at length in

_____

[6] These factors include,

> (1) whether the agricultural employer has the power, either alone or through
> the FLC, to direct, control, or supervise the worker or the work performed
> (such control may be either direct or indirect, taking into account the nature of
> the work performed and a reasonable degree of contract performance oversight
> and coordination with third parties);
> (2) whether the agricultural employer has the power, either alone or in
> addition to another employer, directly or indirectly, to hire or fire, modify the
> employment conditions, or determine the pay rates or the methods of wage
> payment for the worker;
> (3) the degree of permanency and duration of the relationship of the parties, in
> the context of the agricultural activity at issue;
> (4) the extent to which the services rendered by the worker are repetitive, rote
> tasks requiring skills which are acquired with relatively little training;
> (5) whether the activities performed by the worker are an integral part of the
> overall business operation of the agricultural employer;
> (6) whether the work is performed on the agricultural employer's premises,
> rather than on premises owned or controlled by another business entity; and
> (7) whether the agricultural employer undertakes responsibilities in relation to

<u>Champion</u>, require a finding that neither IP nor UC was a joint employer.

IP and UC did not exercise control over the workers materially greater than that exercised by Champion. Appellants argue that IP exercised control over the workers by requiring them to wear orange visibility vests and caps while working on IP's land in Mississippi and Alabama. In fact, IP required the visibility apparel to protect the workers from being accidentally shot by hunters. The requirement applied in only two of the eleven states where IP conducts forestry operations, and the appellants did not demonstrate that the requirement extended to any named parties. If it did, this requirement could constitute an indication of control, even though it existed for the workers' safety.

Appellants also contend that IP's control is evidenced by an instructional videotape it made to demonstrate its planting specifications. This video was made available in Spanish and provided to F&K Enterprises, an FLC that employed three of the named appellants. The record does not show that IP required F&K's

---

the worker which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

<u>Champion</u>, No. 02-12171, slip op. at 12-13. No one of these factors is dispositive in our analysis. <u>Id.</u> at 13-14.

employees to view the video, and it is not clear that any named parties ever saw it. Even if they had, the video, taken alone, would not support a finding of control. IP's specifications are similar to those of Champion. The Department of Labor has remarked that common performance standards, like IP's specifications, "would not, in themselves, constitute indirect control of the work by the person for whose benefit the services are to be performed." Analysis of Comments on Final Rule Issued Pursuant to the Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. 11,734, 11,739-40 (Mar. 12, 1997). We see no reason to conclude that informing workers of these standards should constitute direct control.

The combined weight of IP's video and safety apparel requirement does not tip the balance in favor of the workers. Ultimately, neither IP nor UC assigns laborers or tasks, dictates hiring decisions, designs the laborers' management structure, governs work schedules, or disciplines workers. Therefore, in view of our previous analysis, we conclude that the first factor weighs against a finding of joint employment.

We find that this case is substantially similar to Champion with respect to factors involving the manufacturers' power to modify employment conditions and the permanency and duration of employment. Both of these factors weigh against a finding of joint employment.

The task of planting seedlings is no more or less rote in this case than it was in Champion. Again, we conclude that this factor slightly favors a determination of joint employment.

The record does not indicate that hand planting is substantially more "integral" to IP or UC than it was to Champion. An IP manager's isolated remark that "tree planting is the cornerstone of our business" does not change the fact that forestry constituted only a small portion of IP's overall operations. IP engaged in a wide array of activities other than forestry, including the production of numerous paper products for printing, industrial packaging, construction, and food service. IP's chemical business makes products used in a diverse assortment of goods, including inks, coatings, lubricants, and chewing gum. Moreover, in the relevant years, IP obtained most of its wood requirements not from its forests, but by purchase from other companies. Even if forestry were integral to IP's business, hand planting would not be. Although it currently utilizes hand planting for the majority of its regeneration efforts, IP could opt to use machines instead. Thus, this factor militates against a finding of joint employment.

As in Champion, work in this case was conducted on the manufacturers'

premises.[7]  Consequently, we find that this factor weighs in favor of joint employment but only slightly.

Finally, we find that IP and UC did not differ significantly from Champion in undertaking responsibilities for the agricultural workers that are commonly performed by employers.  The record shows that IP leased portable toilets to the FLCs.  Although appellants cite this fact to support their contention that IP acted as an employer, we draw the opposite conclusion.  If IP itself were providing the toilets qua employer to the agricultural workers, the FLCs would not have needed to lease that equipment.  At the end of the day, IP does not prepare payroll records for the agricultural workers; it does not issue their pay checks or withhold their FICA taxes; it does not provide their workers' compensation insurance, housing, transportation, or tools.  Thus, this factors also weighs against a finding of joint employment.

B.

Although minor distinctions could certainly be drawn between the voluminous records of this case and Champion, we hold that these distinctions do not justify a different result.  The record conclusively establishes that the various

---

[7] There is no testimony indicating, however, that any of the named appellants worked on UC premises.

FLCs were the agricultural workers' sole employers. We therefore affirm the district court's decision granting IP and UC summary judgment on the issue of joint employment.

## III.

Appellants moved for class certification on March 22, 2001. After concluding that IP and UC were not the workers' joint employers, the district court held that the issue of class certification was moot. We disagree.

As explained in <u>Champion</u>, a plaintiff's capacity to act as representative of a class is not necessarily terminated when he loses his case on the merits. <u>See</u> <u>Satterwhite v. City of Greenville</u>, 634 F.2d 231, 231 (5th Cir. Jan.1981) (en banc);[8] <u>see also</u> <u>Armstrong v. Martin Marietta Corp.</u>, 138 F.3d 1374, 1383 n.16 (11th Cir. 1998) (en banc) (noting that in some cases the named plaintiff may appeal a denial of class certification even if she ceases individually to have a controversy with the defendant).

---

[8] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

11

Consequently, we remand for a determination of whether a case or controversy remains after the ruling on the issue of joint employment. If so, the court must determine whether class certification is appropriate.

## IV.

For the foregoing reasons, we AFFIRM the district court's decision granting IP and UC summary judgment. We VACATE the court's final judgment, however, and REMAND the case for further proceedings consistent with part III of this opinion.

SO ORDERED.